## WATSON and wife *vs.* DONNELLY and LYNCH.

Where a testator has mind and memory to understand the situation and value of his property, and the condition and situation of those who by reason of their relationship to him have claims upon his bounty, in such case his will must stand for the reason of the act; and it is not sufficient to impeach his competency that the will is not such, in all respects, as might have been expected from one in his situation.

A British subject holding lands within the United States, and who, by the treaty of 1794 with Great Britain, was authorized to continue to hold them, and to grant, sell or devise the same *to whom he pleased,* in like manner as if he had been a native born citizen of the United States; and who was within the terms of the stipulation that neither those so holding lands, nor their heirs or assigns, should, so far as respected the said land, and the legal remedies incident thereto, be regarded as aliens, had the right to convey or devise the property to *aliens* as well as citizens.

The power to grant or devise to whomsoever the owner pleased necessarily implied a corresponding ability, on the part of the grantee or devisee, to *take* and *hold.*

The treaty, by the term "assigns" embraced, in its spirit, all who should succeed to the title of the original owner by any means other than by descent. And it conferred upon the devisee of such original owner, although an alien, all the rights which he could have had if he had become naturalized. Consequently such devisee could grant or devise the land to any one competent to take.

ACTION of ejectment, to recover an undivided interest in certain real estate situate in the town of Rome, tried before Justice PRATT and a jury, at the Oneida circuit. The plaintiffs claimed in right of the wife as heir at law of Dominick Lynch, deceased. The defendant claimed under a devise from Dominick Lynch to his wife Jane Lynch, and a devise from the latter to the defendant Louisa Lynch.

It was assumed by the judge, at the circuit, that Dominick Lynch and his wife were aliens, and came to this country to reside between 1783 and 1794. There was no proof that either were naturalized, and it was assumed by the judge that the wife never had been naturalized and never filed any declaration to enable her to take and hold real estate under any of the statutes of this state. Dominick Lynch acquired the title to the premises in 1786. On the 17th day of July, 1823, he

made his will, by which he devised one-eighth part of his estate, after setting apart a portion of it for specific purposes, to his wife in fee simple. He died in 1825. In 1831 a decree in partition was made in the court of chancery, in an action in which the widow of Dominick Lynch and James Lynch his son and the father of the feme plaintiff in this action, by descent from whom she claims with others, were parties, by which the premises in question were allotted and set off to the widow Jane Lynch in pursuance of the devise. In 1843 Mrs. Jane Lynch made her will, which was after her death in 1849 admitted to probate, by which she devised all her estate, real and personal, to the defendant Louisa Lynch. The plaintiffs also claimed that the testatrix, Mrs. Lynch, was incompetent to make a will, and was also unduly influenced by the devisee, Louisa Lynch. The judge at the trial nonsuited the plaintiffs, who, upon a case, moved for a new trial.

*T. Jenkins,* for the plaintiffs.

*H. A. Foster,* for the defendants.

*By the Court,* W. F. ALLEN, J. Upon the questions relating to the incompetency of Mrs. Jane Lynch to make a will, and the undue influence exercised over her in the matter of her will, the judge, at the close of the trial, held that there was no sufficient evidence to show that the testatrix was of unsound mind at the time of making the will, or that undue influence was exerted over her which would render it void. He also refused to submit either question to the jury. While courts should be cautious on the subject of interfering with the province of a jury, yet when there is no evidence, or no evidence which would warrant a verdict for the plaintiff, it is the duty of the court to nonsuit. When a verdict for the plaintiff would be set aside as against evidence there is nothing to submit to the jury. (*Stuart* v. *Simpson,* 1 *Wend.* 376.) There is nothing in this case indicating any incapacity in the

testatrix to make her will or do any other act calling for the exercise of judgment and discretion. She was advanced in years, and her bodily infirmities rendered it difficult for her to attend to all her domestic affairs and be about the house as she had been accustomed to do. And as it was not necessary for her to superintend in person all the details of her house-keeping, she very properly and very naturally devolved many of those cares and labors upon her daughter Louisa, living with her. Had she not done so it would have been very singular, under the circumstances, and without explanation would have been stronger evidence of senile imbecility than any which was adduced upon the trial. But the old lady never, and certainly not until within a very few months of her death, which took place six years after the making of the will, gave up the direction of her household and domestic affairs. She managed her own affairs as she pleased, making her own selection of a residence, and leasing her house, and employing such agents and instrumentalities as she thought best. The whole case shows that she had mind and memory to understand the situation and value of her property, and the condition and situation of those who by reason of their relationship to her had claims upon her bounty. In such case her will must stand for the reason of the act, and it is not sufficient to impeach her competency that the will is not such in all respects as we should have expected from one in her situation. It is possible that if we could be placed precisely as she was situated, and have knowledge of all the circumstances which operated upon her mind, we should see very satisfactory reasons for the disposal of her property in the manner provided for by the will. The circumstances relied upon to establish incompetency are very slight, and are entirely consistent with the possession of a disposing mind and memory. The failure to recognize a friend or relative at first view, on a few occasions, whether attributable to the position of the party in reference to the light, to imperfect vision, or a want of ready recollection at the instant, comes far short of proving imbe-

cility. The collection of the toys and dolls, and their arrangement, before the christmas festival of 1843, is explained by the evidence as an effort to provide a treat and to give pleasure to her grand and great-grandchildren, who were accustomed to visit her at that season. They were not heard of as occupying her thoughts or her time after christmas of that year, or as being in her possession, and the collection was made during the fall of that year. There is an entire want of proof that any influence was exerted over her in the matter of her will, by any one. She communicated the fact of making the will, by letter to her son Jasper, not long after it was made. There were doubtless reasons connected with her own personal comfort, why the will was not published to her children and grandchildren in New York. Such instruments are not ordinarily made public before the death of the testator. Before the condition and circumstances of her kindred can be called in aid, as a circumstance tending to establish either incompetency or undue influence, there must be some independent evidence tending to show one or both, in impeachment of the will. Had the questions been submitted to the jury, and they had found for the plaintiffs upon either ground, the verdict would have been set aside as against evidence. (*Stewart* v. *Lispenard,* 26 *Wend.* 255. *Blanchard* v. *Nestle,* 3 *Denio,* 37. *Clarke* v. *Sawyer,* 2 *Comst.* 498.) Upon the plaintiffs' case the will was not impeached, and the testimony on the part of the defendants, to which reference will not be made in detail, establishes the competency of the testatrix, and that the instrument was in truth her will, and was not the result of undue influence over her. Age and bodily infirmities had affected her mental faculties much less than is usual in persons of her years. Her vigor of intellect was very little if at all impaired at the time of making the will.

The only questions of moment, in the case, are the capacity of the testatrix to take, under the will of her husband, and her power to devise the estate at her death.

It must be assumed, upon this motion, as it was by the

judge at the trial, that Mrs. Jane Lynch was an alien, and the same evidence by which her alienage was shown established that of her husband. Neither were residents of the state before the treaty of peace of 1783, and neither became citizens of the United States by naturalization. But the right to hold real estate does not depend upon the citizenship or allegiance of the party. Aliens may be permitted to take real estate by descent or in any other way, and to hold and dispose of the same, by the municipal law of the state or under treaties made by the federal government with foreign states, which are a part of the supreme law of the land.

Dominick Lynch was, as is conceded, within the provisions of the 9th article of the treaty with Great Britain, of 1794. He was then a British subject holding lands within the United States, and was by that treaty authorized to continue to hold them, and to grant, sell or devise the same to whom he pleased, in like manner as if he had been a native born citizen of the United States; and he was within the terms of the stipulation that neither those so holding lands, nor their heirs or assigns should, so far as respected the said lands and the legal remedies incident thereto, be regarded as aliens. (8 *U. S. Stat. at Large*, 122.) State legislation could not affect or impair the rights secured by this treaty. The rights became vested at once, and were beyond the reach of state interference. (*Jackson* v. *Wright*, 4 *John.* 75. *McIlvaine* v. *Cox's Lessee*, 4 *Cranch*, 209. *Fairfax* v. *Hunter*, 7 *id.* 603. *Chirac* v. *Chirac*, 2 *Wheat.* 259.) This treaty was in force in 1825 when Dominick Lynch made his will. By the treaty he was authorized to devise the land *to whom he pleased*, and his heirs and assigns were in respect to the lands to be regarded as citizens, or rather were not to be regarded as aliens. The power to grant or devise to whomsoever the owner pleased, would necessarily imply corresponding ability of the grantee or devisee to take and hold; else the treaty would provide for a vain thing, to wit, a grant or devise, which would be fruitless. We cannot suppose this to have been the intention of the contracting

states. The language when used as it was in respect to aliens, and to secure to them certain rights of property with the right of full and free disposal as if they were native citizens, gives the right to convey or devise the property to aliens as well as citizens. The expression " to whom they please" would have had no place in the treaty, if the design had been to restrict the power to grant and devise, to grants and devises to those who as citizens, and in their own right and irrespective of this stipulation, had power to take. Had the stipulation stopped there, the right of the alien owner to devise or grant to aliens would have been complete. But, as it were from more abundant caution, the clause is added that neither they, (the then owners,) nor their heirs or assigns, should be regarded as aliens in respect to said lands and the legal remainders incident thereto. The assigns of the then owner were to stand in the same situation as their grantors or assignors. Their alienage was to be ignored, and in respect to such lands they were to enjoy all the rights of native citizens. " Heirs and assigns " were used in the last clause of this section of the treaty as embracing all who could in any manner succeed to the title of the alien owner, dividing them into two classes in reference to the mode of acquiring title, to wit, those acquiring title by descent and by purchase, the latter class including devisees. Purchase, in its most enlarged sense, signifies the lawful acquisition of real estate by any means whatever except by descent. (2 *Bl. Com.* 241.) The term " assigns" is as comprehensive as that of purchaser, or " one taking by purchase." It means those to whom rights have been transmitted by particular title, such as sale, gift, legacy, transfer or cession. (*Bouv. Dict.* " *Assigns.*" *Booth's case,* 5 *Co. Rep.* 77 *b.*) The treaty authorized the alien owner to " grant, sell and devise," and then gives to the " assigns" all the rights of citizens, in respect to said lands. A devisee is clearly within the intent of the provision and the equity of the treaty. The word " assigns" was technically inapplicable to grantees of real estate in fee simple, but it was a convenient term to use, embracing in its spirit all that suc-

ceeded to the title by any means other than by descent. If this is the true construction of the treaty, it disposes of the case; for it conferred upon Mrs. Lynch, the devisee, all the rights, in regard to this real estate acquired under the will of her husband, which she could have had if she had become naturalized, and she could of course grant or devise it to any one competent to take; and the competency of her devisee, Louisa Lynch, is not disputed. Alien heirs take by descent the real estate of their ancestors who were British subjects at the time of the treaty of 1794, and the rights of heirs are no better secured than are those of grantees or devisees. They all stand upon the same footing. (*Shanks* v. *Dupont*, 3 *Peters*, 242.) The language of Chancellor Kent, in *Goodell* v. *Jackson*, (20 *John.* 707, 708,) is pertinent to this case. It would be a reproach to good sense as well as to the good faith of the government to suppose they intended any thing less than their words imported. To say that the owner may sell or devise to whom he pleases is not consistent with the claim that unless the grantee or devisee answers a certain description he shall not take. To say that alienage shall not be imputed to the assigns of the owner as affecting their title to the estate, or the legal remedies relating thereto, is not consistent with the claim that the estate cannot be conveyed to aliens, but must descend to those capable by the municipal law of the state to take by inheritance. *Bright's Lessee* v. *Rochester*, (7 *Wheat.* 535,) does not affect this case. There the ancestor came to this country after the treaty of 1783, and died before that of 1794, seised of the lands in suit. He could not at the time of his death transmit lands to his heirs, and the latter, therefore, under whom the plaintiff claimed, had not at the time of the signature of the treaty of 1794, any title upon which that treaty could operate. Had the alien ancestor devised the estate to the individual claiming as heir, the provisional title would have vested in him, and the treaty would have confirmed that title. *Jackson* v. *Wright*, (4 *John.* 75,) is only distinguished from this case by the fact that there the estate vested

in alien heirs, and here in an alien devisee.　Van Ness, justice, speaking of the treaty of 1794, says : " The intention of the contracting parties to that treaty was that the citizens and subjects of each should be quieted in the enjoyment of their estates, in the same manner as if they and their heirs had been native citizens." *(And see Jackson* v. *Adams,* 7 *Wend.* 367, *and Munro* v. *Merchant,* 26 *Barb.* 383.)　The case of *The Duke of Cumberland* v. *Graves,* (3 *Seld.* 305,) is in principle decisive of this case.　The plaintiff, an alien, claimed to hold land conveyed under the provisions of the act of April 2, 1798, the first section of which is as follows : " All and every conveyance or conveyances hereafter to be made or executed to any alien or aliens not being the subject or subjects of some sovereign state or power, which is or shall be at the time of such conveyance, at war with the United States of America, shall be deemed valid to vest the estate thereby granted in such alien or aliens ; and it shall and may be lawful to and for such alien or aliens to have and to hold the same to his, her or their heirs or assigns for ever, any plea of alienism to the contrary notwithstanding ;" with a proviso not pertinent to the question here.　The Court of Appeals held that land conveyed to an alien pursuant to the provisions of that act might continue to be held by alien heirs and *alien devisees* of the grantee, until by inheritance, devise or grant the title came to a citizen. The plaintiff, an alien, claimed under a will of an alien, and his title was held valid ; and the word " assigns," in the act, was the only word under which a devisee could claim.　The opinion of Judge Ruggles is entirely applicable to, and decisive of, the question made upon this branch of the case, as to the right of Mrs. Lynch to take as devisee and in turn to devise to her daughter.　This being the effect of the treaty of 1794, and the right of alien owners to devise to aliens being guarantied by it, the act of 1825 could not divest them of that right, or deprive the alien devisee of the right to take and hold the estate.　The treaty is the paramount law of the land ; and even if it were abrogated by the original contracting parties, the

vested rights of citizens, under it, would remain. (*Const. of U. S. art.* 6, § 2. *Lessees of Gordon* v. *Kerr*, 1 *Wash. C. C. R.* 323. *Hare* v. *Hylton*, 3 *Dall.* 236. *Denn* v. *Fisher*, 1 *Paine's C. C. R.* 54. 8 *Wheat.* 494.) It is not necessary then to consider the effect of the act of 1825 upon the devise of Dominick Lynch, or determine whether it destroys the common law rule by which an alien purchaser or devisee could hold the estate purchased or devised, as against all but the government; by which he could take the estate, although not for his own use but the use of the state. (*Jackson* v. *Beach*, 1 *John. Cas.* 399. *Jackson* v. *Lunn*, 3 *id.* 109. *People* v. *Conklin*, 2 *Hill*, 67.)

The motion for a new trial must be denied.

[ONONDAGA GENERAL TERM, January 4, 1859. *Bacon, W. F. Allen* and *Mullin*, Justices.]