ULSTER COUNTY.—HON. ALTON B. PARKER, SURROGATE.— April, 1879.

## LEGG v. MYER.

*In the matter of the probate of the will, and codicils thereto, of* EPHRAIM P. MYER, *deceased.*

While it is true, as laid down in Delafield *v.* Parish (25 *N. Y.*, 9), that it is not the duty of the court to strain after probate,—neither should it, on the other hand, strain against probate, where the will seems unfair, but, if the testator appears to have had capacity, care should be taken to carry out his wishes.

If one be *compos mentis*, he can make any will, however complicated; otherwise none, however simple. He who asserts, of a testator, the unnatural condition of *non compos mentis*, must prove it.

The will propounded was executed in 1869, and the first codicil in 1872. The testator, on December 15, 1877, was stricken with apoplexy, resulting in paralysis. Shortly before this, he had arranged to add a second codicil to his will, and gave a memorandum to a draftsman for that purpose. The alleged execution of the second codicil, which was contested, was on January 25, 1878. The death occurred October 14, of that year. When first taken, testator was unconscious, but he rapidly improved in mind and body, so that his physician ceased to attend him, and, though he never regained power of speech, or his former mental vigor, he became able to and did read, the Bible much, and the paper daily, often calling attention to items which interested him; received visits, shook the hands of visitors, understood conversation, and manifested an interest in his pecuniary affairs; in short, was able to comprehend the extent of his property, the number of his children, and their relations to him, and had sufficient mind to understand the ordinary business transactions of life. It was shown that he took the codicil, after it was read to him, and read it himself, pointing to certain words which at first he was unable to decipher, after which the same was duly executed.

*Held*, that the testator, at the time of the execution of the contested instrument, was possessed of that moderate degree of capacity necessary to enable him to make a testamentary disposition, and that the codicil must be admitted to probate.

The rule, in Delafield *v.* Parish, as to the essentials of testamentary capacity, and the burden of proof in respect thereto,—expounded.

APPLICATION, by Francis Myer, executor, etc., of de-

cedent, for the probate of his will and codicils thereto ; opposed by Rachel J. Legg, his daughter.

A will and two codicils were offered for probate ; the will dated February 5, 1869, the first codicil dated August 16, 1872, and the second and last codicil dated January 25, 1878. No contest was made with reference to the will and first codicil, and they were admitted to probate without objection.

Objection was made to the second codicil, upon the grounds that the testator did not have testamentary capacity at the time of the alleged execution of the paper, and also that it was not the last will and testament of the alleged testator, Ephraim P. Myer. Other objections were made, but evidence was introduced only in support of, or opposition to, the above objections. Further facts appear sufficiently in the opinion.

B. M. Coon, *for proponent.*

Herman Winans, *for Mary C. Fields.*

Peter Cantine, *for contestant.*

The Surrogate.—Epraim P. Myer, an old resident of Saugerties, was, on December 15, 1877, stricken with apoplexy, resulting in paralysis. Dr. Chipman, his attending physician, testifies that, when first taken, he was unconscious, unable to move, and had no sense of touch ; his right side was paralyzed, the left side affected by the shock, but not permanently ; during the first few days, there was a great improvement in mind and body. From the evidence of all the witnesses, it appears that the deceased was never able to talk again, although one or two most familiar with him testify to the use by

him of a few words, which they understood. On the 25th of January, following, the codicil in question was executed, the testator living until October 14, 1878. It is insisted, on the part of the contestant, that the testator, on January 25, 1878, did not have a disposing mind and memory, and, not being able to talk, could not explain his wishes. Before discussing the evidence particularly upon this question, we will examine the law relating to a disposing mind, as settled and adjudicated by the courts of this state.

In Delafield *v.* Parish (25 *N. Y.*, at p. 97), the majority of the court lay down the following legal propositions: In law, the only standard as to mental capacity, in all who are not idiots or lunatics, is found in the fact whether the testator was *compos mentis* or *non compos mentis*, as those terms are used in their fixed legal meaning. Such being the rule, the question in every case is— had the testator, as *compos mentis*, capacity to make a will? not—had he capacity to make the will produced? If *compos mentis*, he can make any will, however complicated; if *non compos mentis*, he can make no will, not the simplest. At common law and under our statutes, the legal presumption is that every man is *compos mentis*, and the burden of proof that he is *non compos mentis* rests on the party who alleges that an unnatural condition of mind existed in the testator. He who sets up the fact that the testator was *non compos mentis* must prove it.

These rules, differing though they do very materially from those laid down in the opinion of Judge DAVIES in the same case, are nevertheless considered the settled law in this State. It is, then, a question of fact, for the

court to determine from the evidence, whether or not the testator on that day was *compos mentis*; whether he had a sound and disposing mind and memory, or not. It is a circumstance of no small importance that the testator, before his sickness, and while it is conceded by all that he was of sound mind, determined to add a second codicil to his will, and asked Mr. J. K. Merritt, at his store, to draft it for him; this Mr. Merritt promised to do; and shortly afterwards deceased was stricken with paralysis. At the time of this conversation with Mr. Merritt, he gave him a piece of paper, containing memoranda for the codicil. This paper was introduced in evidence, and differs in two respects from the codicil as finally executed. Thus it appears that, while there was no question about his being sound in mind and memory, he determined to change somewhat the disposition of his property, as made by the first will and codicil. This fact is only important, however, in so far as it demonstrates that the intent to change the will was not the creation of the disease, for, whatever may have been his intention before, if he was not *compos mentis* on January 25, 1878, he could not make a will.

It is, therefore, necessary to consider briefly the testimony of the witnesses, bearing upon the mental condition of Mr. Myer from December 15, 1877, to and including the 25th day of January, following.

Francis Myer, the executor named in the will, and whose interests are not affected by the codicil, testified, among other things, that when father was first taken he was unconscious. "I saw him nearly every day, the first week. From the time he became conscious, he gradually improved, both in mind and body. Four or five

days after he was taken, he began to nod, and shake his head for yes and no, in response to questions put to him. I was at his house, at an average, twice a week, from the time he was taken sick, until the 25th of January. He, at times, called my attention to articles in the paper that he had been reading. I remember, now, of his calling my attention to a death notice of one of his old neighbors, and then looking up, as if he wanted to hear about it. He also pointed out to me, at one time, the tax collector's notice in the paper, giving the last day to pay at one per cent."

Rev. Sanford H. Cobb, his pastor, who called on him very frequently, and noticed and carefully weighed each symptom of mental improvement, testified that he saw him within thirty-six or forty-eight hours after he was taken sick, and saw him, on an average, at least once a week, until the 1st of March, following. "When I first saw him, he was helpless in body, and there was no evidence of mental state. During the first part of his seizure, I was there frequently. On the second visit, I do not know as I observed any special change in his condition. The improvement I noticed subsequently, can, perhaps, better be characterized as an improvement in general condition. At the first visit, the physical blow appeared to be of such a character as to preclude any mental manifestations; afterwards, the weight of the blow seemed to be relieved, so that mental manifestation was possible. After the first two or three visits, I talked with him a great deal. He always appeared to understand what I said to him. My impression is that he invariably shook hands with me when I came in."

Austin Preston, an old and intimate friend of the

deceased, and a member of the same church, in the prosperity of which each was deeply interested, testified, in substance, that he called on Mr. Myer about a week after he was taken sick, and was very much surprised to find that his mind was so good. He says: "I had not got near to the bed, before he put out one hand, to shake hands with me. I talked to him. I could talk to him quite well, being used to talking with a man deaf and dumb. He seemed to understand what I said. I had no difficulty in making him understand, or understanding his replies. He appeared to be better every time I called. I often found him reading."

Erastus D. Chipman, the family physican, and the only physician sworn in the case, says: "I have been a practicing physician for sixteen years; I attended Ephraim P. Myer during his last sickness. When I first called, he was unconscious mentally; his tongue was paralyzed, so that it was impossible for him to articulate so as to be understood. I visited him on the 15th, 16th, 18th, 19th, and 21st days of December, 1877. During those few days, there was a great improvement in mind and body. After that, while the improvement was gradual, it was not so marked. His mind was not as strong and vigorous as if he had not had the attack. On January 6th, he was so much improved in mind and body that I ceased my visits. I want to be understood as saying that this man's mind was not as strong after the paralysis as previous to it—that his mind was not destroyed, but enfeebled."

Twelve witnesses testified as to the mental and physical condition of Mr. Myer, after he was stricken with

paralysis, from which the court is to determine the mental soundness or unsoundness of the deceased.

These witnesses were examined by counsel skillfully and at great length ; but the evidence above quoted, from witnesses called by the contestant, clearly and fairly states the substance of the testimony of all the witnesses.

In addition to the opinions given, we have the fact that he read the Bible a great deal, the paper almost every day, frequently calling the attention of members of his family and visitors to items that particularly interested him, and giving them to understand that he wanted to hear more about it ; calling his son's attention to a collector's notice stating the time during which taxes could be paid at one per cent., and signifying his desire to have his taxes paid immediately.

He also read some portion of the life of Dr. Henry Ostrander, particularly a sermon on Old Age, in which he seemed greatly interested, and would frequently call the attention of persons to some passage in it.

A careful examination of the evidence submitted, aided by the thorough and able arguments of counsel, satisfies the court that deceased was *compos mentis* on January 25, 1878. Beyond all question, his mind was somewhat enfeebled by the effect of the stroke ; it was not as vigorous as before his illness ; yet, from the testimony of all the witnesses, it seems that, after the first few days, he could and did understand everything that was passing on about him. He had sufficient mind to comprehend the extent of his property, the number of his children and their relations to him,—sufficient mind,

at least, to comprehend the ordinary business transactions of life.

Mere weakness of mind is not sufficient to invalidate a will, if the testator had sufficient mind to comprehend the nature and effect of the act he was performing, and the relations he held to the various individuals who might naturally be expected to become the objects of his bounty (Forman *v.* Smith, 7 *Lans.*, 443). When it is considered that a very large proportion of wills are made in old age or upon the sick bed, after the mind has lost a portion of its former vigor, and has become somewhat enfeebled by age or the effect of disease, the wisdom of the above rule becomes apparent.

While it is true, as stated in the opinion of the court, in Delafield *v.* Parish (25 *N. Y.*, 35), that it is not the duty of the court to strain after probate, nor in any case to grant it where grave doubts remain unremoved, and great difficulties oppose themselves to so doing ; neither is it the duty of the court to strain against probate, where the provisions of the will seem to the court unfair, but, on the contrary, where the court is satisfied that the testator had sufficient mind and memory to understand his relations to other persons, and the nature and extent of his property, great care should be taken that the wishes of the testator be fully carried out. In such a case, says the court, in Watson *v.* Donnelly (28 *Barb.*, 653), "his will must stand for the reason of the act, and it is not sufficient to impeach his competency, that the will is not such, in all respects, as might have been expected."

There is no evidence of undue influence, and the testimony of the subscribing witnesses, Mr. Coon, the lawyer

who drew the codicil, and Mr. Merritt, who had been consulted on the subject by Mr. Myer before his sickness, shows conclusively that the codicil in question was legally and properly executed.

The evidence of these witnesses, given with great care and minuteness of detail, was also of great advantage to the court, in determining whether or not the testator had sufficient testamentary capacity to make a will on January 25, 1878.

From their testimony, it appears that, after the codicil was carefully read over to Mr. Myer by Mr. Coon, he then, of his own motion, took the codicil and read it over; two or three words he was unable to make out, and when he came to each word, pointed it out to Mr. Coon, who pronounced it, after which he continued reading; when he had finished reading, he signified his approbation, and the codicil was then executed with legal formality. The evidence fully establishes that Ephraim P. Myer, on January 25, 1878, as *compos mentis*, had sufficient capacity to make a will; that the making of such codicil was not the result of undue influence; and that such codicil was legally executed.

No objection having been made to the will and first codicil, and they having been properly proved, the will and both codicils are therefore admitted to probate.

Decreed accordingly.