CATTARAUGUS COUNTY.—HON. ALFRED SPRING, SURROGATE.—January, 1883.

WOOD v. BISHOP.

*In the matter of the probate of the last will and testament of* JAMES E. BISHOP, *deceased.*

The law of wills has for its foundation the right of every man to dispose of his property as he chooses, however absurd or inequitable the disposition may appear to others.

While it is not the proper policy for courts to "strain after probate," it is equally true that they should not strain to refuse it.   There is no procrustean rule either way.

Though differences, in a will, from testator's previous intentions as expressed in a prior will, tend strongly, when associated with other facts,

to establish undue influence, yet where the proof is barren of such concomitant facts, the mere circumstance is of no importance; otherwise a change of testamentary intention would be forever barred.
Authorities on the question of undue influence,—collated.

PETITION, by Lemuel P. Bishop and another, for the probate of decedent's will; opposed by Joel Wood, named as executor in an alleged prior will, and others. The facts appear sufficiently in the opinion.

NASH & LINCOLN, *for proponents.*

D. J. WILCOX *and* F. W. STEVENS, *for contestants.*

THE SURROGATE.—For a year or two previous to his death, testator was afflicted with epileptic fits occurring at infrequent intervals, and it is claimed on the part of contestants that these fits had so enfeebled him as to render him incapable of executing a will; and, second, that the will was the result of undue influence exerted by or at the instigation of the principal beneficiaries named in the will.

Testator had always been a hard working, economical farmer, of ordinary acquirements, and had managed to accumulate a small property, not exceeding in value three thousand dollars. He had lost his wife several years previous to his death, which occurred in February, 1882. He left him surviving five children, each of whom was married at the time of his death. After his wife died, testator lived a portion of the time with his son William, but latterly with Perry, who, with his wife, gets the greater part of the property by the last will of testator, which was executed on December 24th, 1881

On the trial, a large number of witnesses was sworn on both sides, who testified as to the mental capacity of tes-

tator. The peculiarities of speech and action detailed by the various witnesses for the contestants, were noticeable usually when he was recovering from the prostration incident to his fits, or during his sickness, in December. Dr. Pool visited him in the summer preceding his death, and evidently at a time when he was recovering from an attack of epilepsy, for the doctor was convinced that he was not only incapable of transacting any business, but that he would remain permanently in that condition; and yet after this he moved to Bucktooth, and, while there, executed the will relied upon by contestants, when he was without doubt *compos mentis.* In fact, a considerable portion of contestant's testimony relates to a time anterior to his removal to Bucktooth, and is, therefore, in view of his clearly established mental vigor while there, of but little moment in this case. He returned from Bucktooth with his son Perry, and went to living on his home farm in New Albion in the latter part of November; and shortly after was taken sick with a prostrating illness which lasted two or three weeks. During its continuance, there were times when he was incapable of executing a will or transacting any business, and the contestants have produced several witnesses who testify to facts unmistakeably showing mental incapacity —at that time. After this, he rallied sufficiently to be about the house, and also regained in part his mental vigor. After his return from Bucktooth, he does not seem to have suffered any from epileptic fits.

Several witnesses on behalf of proponents testify to transactions and circumstances showing the old gentleman was not bereft of his sense and judgment. About the time the will was made, one of the neighbors pur-

chased a wood-mill of him, and they made the bargain, the testator seemingly comprehending it fully. One of the neighbors, Matthew Smith, visited him once or twice, to induce him to reduce the rate of interest on a mortgage held by testator against him, so as to conform to the six per cent. rate then recently the law. Testator declined to do this, stating that he was advanced in years, unable to earn his own livelihood, and consequently in need of the money, while the mortgagor was young, vigorous and able to work. When the interest money was paid him, he counted it personally.

This same neighbor, about this time, sold testator a quarter of beef, which the old gentleman bargained for, and when the beef was brought in, wittily remarked, that he guessed it was better to kill the cow than to try and winter her; that he had cows in his herd no fatter than she was. And he then apologized for this cynicism by saying that he was in the house all the time, and must say something. The witness Pratt was an old friend and neighbor of testator, and a man of intelligence and apparent candor and truthfulness. He visited testator nearly every day, and related several conversations, in each of which testator was rational.

The will was drawn by Mr. Nash, a reputable attorney, long a resident of the same town in which testator resided, and an acquaintance of many years' standing. Mr. Nash reached testator's the evening preceding the execution of the will, and prepared the same that evening, at the dictation of testator. Decedent gave Mr. Nash a statement, in detail, of his property, and gave reasons for the disherison of his son William, and for the small bequests to others of his children. The will was executed on the

succeeding morning, in accordance with the formal requirements of the statute. The subscribing witnesses unite in saying that, at that time at least, he was competent to execute the will. These various circumstances satisfy me that testator was of disposing mind at the time the will was drawn and executed. Of course, it could not be expected that a man of his limited education and restricted methods of thinking would perform acts and engage in conversations like a man of Chesterfieldian polish or one wonted to habits of profound thought, but in his sphere they certainly indicate that he was capable of appreciating who were the proper objects of his bounty, and the nature and kinds of his property. The bare fact that he was to a certain extent impaired mentally is not a sufficient reason for rejecting his will. The court, in Horn v. Pullman (*72 N. Y., 269*), say, at page 276: "There is no presumption against a will because made by a man of advanced age, nor can incapacity be inferred from an enfeebled condition of mind or body. Such a rule would be dangerous in the extreme, and the law wisely sustains testamentary dispositions made by persons of impaired mental and bodily powers, provided the will is the free act of testator, and he has sufficient intelligence to comprehend the condition of his property and the meaning and effect of the provisions of the will."

On the question of undue influence, contestants rely in the main upon two circumstances: 1st, that the will propounded was in opposition to testator's previously expressed intention, as appears from the will made at Bucktooth in September, 1881; and, 2d, the fact that testator resided with the principal beneficiaries of his will, thus affording to them the opportunity of exerting undue in-

fluence upon him, they contending that this is presumptive proof that he in fact fell a victim to such influence.

When the first will was made, testator resided with Perry, and apparently he was no more vigorous in mind then than when the last will was executed; so that whatever objections are tenable against the one instrument would apply with equal pertinence to the other. His hostility to William commenced before his removal to Bucktooth, and, for aught that appears, was fanned and kept burning by the old gentleman himself, and the case is devoid of a circumstance even tending to show that Perry or his wife encouraged or abetted this antipathy in the least. A man of advanced years, with little to arrest his attention or occupy his time conceives his dislikes frequently from a trivial cause, and, if he has a predilection for morbidly thinking, and his range of thought is narrow and confined, he will expand a triviality into something of great importance. But the old gentleman's difficulties with William were grounded on something serious, for they had resorted to arbitration to adjust their differences, and this certainly does not imply that the warm feelings usual between father and son existed between them. While the fact that a will is contrary to the previously expressed intentions of a testator is oftentimes a strong circumstance, when associated with other facts, to establish undue influence, yet, as in this case, where the proof is barren of those concomitant circumstances, the bare fact is of no importance; otherwise a change of testamentary intention would be forever barred. The undue influence necessary to reject a will must be such as to destroy free agency on the part of testator, depriving him of the mental and moral power to act freely, and

constraining him to execute a will contrary to his own wishes (1 Redf. on Wills, *529, 530;* Rollwagen v. Rollwagen, *63 N. Y., 504;* Brick v. Brick, *66 N. Y., 144, 149;* Tucker v. Field, *5 Redf., 139;* Ewen v. Perrine, *id., 640).*

Undue influence will not be presumed, but must be proved, either by direct affirmative evidence, or by an array of circumstances making an inference of its exercise absolutely irresistible (Cudney v. Cudney, *68 N. Y., 148;* Marx v. McGlynn, *88 N. Y., 357;* Merrill v. Rolston, *5 Redf., 220;* La Bau v. Vanderbilt, *3 Redf., 384, 441).*

The testator, in the case under consideration, resided with the principal beneficiaries of the will, and was kindly cared for by them; he stated to Mr. Nash that he might live for some time, and wished a home with them. He could not live with his son William and his family amicably, and Perry was the only child, aside from him, who resided in New Albion, where he had spent his years of manhood, and which seemed to be the only abiding place he desired. His small property divided among his five children would not benefit them materially, and the fact that he chose to keep his little farm intact by willing the bulk of his property to those who kindly cared for him in his declining years is no reason for terming his will unjust or refusing it probate. Gratitude and the promptings of affection courts have always been careful to distinguish and discriminate, in discussing and deciding questions of undue influence. The secret motives actuating a competent testator are not always discernible and are of themselves unimportant. The law of wills has for its foundation the right of every man to dispose of his property as he lists, however absurd or inequitable it may seem to others (cases cited, *supra;* Seguine v. Seguine, *3 Keyes, 663;* Peck v. Cary, *27 N. Y., 18).*

Counsel for contestants, in his excellent brief, argues with some vehemence that it is not the policy of courts "to strain after probate" of a will. Assuredly so, but the converse of the proposition is equally true, that courts should not "strain" to refuse probate (Legg v. Meyer, *5 Redf., 628*). There is no procrustean rule either way. If the testator possesses testamentary capacity, and the will is his free act, his wishes should be carried out, or the statute of wills is a mockery, and the learning expended thereon useless verbiage. If these two essential ingredients are lacking, a refusal to admit to probate should of course follow.

The will propounded, having been executed by a competent testator while free from restraint, and in compliance with the formal requirements of the statute, should be admitted to probate as a will of real and personal estate, and I so decide and direct.

Decreed accordingly.